**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | |
|---|---|
| **SETH BARRETH,** | |
| *Plaintiff,* | |
| **v.** | **CIVIL ACTION NO.** |
| | **5:19-cv-00320-TES** |
| **REYES 1, INC. d/b/a LITTLE CAESARS PIZZA,** | |
| *Defendant.* | |

**ORDER GRANTING IN PART AND DENYING IN PART**
**DEFENDANT'S MOTION TO DISMISS**

Relying on Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), Plaintiff Seth Barreth claims that Defendant Reyes 1, Inc. d/b/a Little Caesars Pizza ("Little Caesars") subjected him to harassment and a hostile work environment, constructively terminated him, and retaliated against him because of his sex. [Doc. 11 at p. 1]. Now, Little Caesars, under Federal Rule of Civil Procedure 12(b)(6), seeks dismissal of Barreth's claims asserted against it. After a very thorough and close review of the Amended Complaint, the parties' briefs, and the applicable law, Little Caesar's Motion to Dismiss [Doc. 20] is due to be **GRANTED in part** and **DENIED in part**.

## FACTUAL BACKGROUND

Barreth acknowledges he was born female; however, since 2013, he[1] has presented as a male. [Doc. 11 at ¶ 9]. While he has yet to change his sex[2] on his government-issued identification, he has legally changed his name. [*Id.*].

After a telephone interview, Little Caesars decided to hire Barreth as a Crew Member. [*Id.* at ¶¶ 11–12]. However, his employment was short-lived—30 days, at most. While Barreth never says when his first day of training was, we know that he went to complete his onboarding paperwork and receive his uniform on April 26, 2018, and later resigned on May 26, 2018. [*Id.* at ¶¶ 13, 17, 39–41]. When he was picking up his uniform, Store Manager Lachelle Lester informed Barreth that Little Caesars "had to run a background check." [*Id.* at ¶¶ 12–13]. It wasn't until then that he mentioned either his gender identity or female-to-male transition and informed Ms. Lester that his background check would still identify him as a female. [*Id.* at ¶¶ 10, 13–14]. Barreth claims that he never asked Ms. Lester to "instruct anyone to refer to him as any gender" or authorized her (or anyone from Little Caesars) "to disclose or discuss his gender identity or transition with anyone." [*Id.* at ¶ 16]. Yet, on his first day of training, Barreth "was referred to as a 'she' by a coworker," and nine days before he stopped coming into

---

[1] To be consistent with the Amended Complaint and the parties' references and arguments, the Court refers to Barreth with masculine pronouns such as "he/him/his."

[2] Barreth apparently refers to one's sex as his or her "gender marker." [Doc. 11 at ¶ 9]. The Court does not.

the store to work, he alleges that his direct supervisor, Shift Leader Indya Williams, made several inappropriate comments to him. [*Id.* at ¶¶ 17–19, 39, 41].

Prefacing her questions with the notion that she didn't "want [Barreth] to be offended," Ms. Williams asked him if he "[had] a dick," if he "[had] titties" or had "them removed," and if he was "on hormones." [*Id.* at ¶¶ 20–21]. When Barreth ignored Ms. Williams' questions, she said to him, "you probably can't have kids, can you?" [*Id.* at ¶¶ 22–23]. Rather than respond to her specific questions, Barreth asked "who . . . disclosed his gender identity to her" and immediately stepped outside, called Ms. Lester, and explained to her that Ms. Williams had asked him questions about his genitalia and made remarks about his "supposed inability to reproduce." [*Id.* at ¶¶ 24, 26–27]. During this call, Ms. Lester stated that she had "already discussed [Barreth's] situation with everyone" and "that 'everyone' knew what was going on." [*Id.* at ¶¶ 27–28].

Thirty minutes later, Ms. Lester arrived at the Little Caesars store and finished the shift with both Barreth and Ms. Williams. [*Id.* at ¶ 29]. However, according to his Amended Complaint, Ms. Lester never provided any disciplinary action for Ms. Williams' conduct, never followed up to make sure Ms. Williams' treatment had stopped, and never asked Barreth whether he was "alright." [*Id.* at ¶¶ 30, 38]. In fact, whenever he and Ms. Williams were assigned to the same shift, Barreth contends that she would not only scrutinize his work, assign him additional tasks, blame him for

3

things that were not his responsibility or fault, but would also "threaten[ ] to write him up." [*Id.* at ¶ 31]. Other than this, she refused to interact with him. [*Id.* at ¶ 32].

After the incident involving Ms. Williams, Barreth alleges that "his coworkers and supervisors began frequently calling him a 'he-she' and making similar disparaging comments to and about [him] and his gender identity." [*Id.* at ¶ 33]. Due to this treatment, Barreth resigned. [*Id.* at ¶¶ 39–41]. And after his resignation, he claims that Little Caesars "made it difficult for [him] to receive his final paycheck." [*Id.* at ¶ 42]. Although it came "several days late," Barreth received his final paycheck in the mail. [*Id.* at ¶ 43]. In addition to issues related to his final paycheck, Barreth contends that Little Caesars "has taken additional actions to harass [him]" by persistently referring to him with feminine pronouns "in a written statement dated several months after the incident." [*Id.* at ¶ 46].

## DISCUSSION

### A.    Legal Standard

When ruling on a motion under Federal Rule of Civil Procedure 12(b)(6), it is a cardinal rule that district courts must accept the factual allegations set forth in a complaint as true. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007). Under this Rule, a defendant may test the legal sufficiency of a complaint by way of a motion to dismiss. *Milo v. CyberCore Techs., LLC*, No. SAG-18-3145, 2020 WL 134537, at *3 (D. Md. Jan. 13, 2020). This motion is an "assertion by a defendant that, even if the facts alleged by a

plaintiff are true, the complaint still fails as a matter of law to state a claim upon which relief may be granted." *Id*. However, a complaint survives a Rule 12(b)(6)-based motion if it alleges sufficient factual matter (accepted as true) that states a claim for relief that is plausible on its face. *McCullough v. Finley*, 907 F.3d 1324, 1333 (11th Cir. 2018) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009)). In fact, a complaint "may proceed even if it strikes a savvy judge that actual proof of [its] facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (citations omitted).

Whether a complaint states a claim for relief is measured by reference to the pleading standard of Rule 8—a "short and plain statement of the claim showing that the pleader is entitled to relief." *Milo*, 2020 WL 134537, at *4; Fed. R. Civ. P. 8(a)(2). Although Rule 8 does not require <u>detailed</u> factual allegations, it does require "more than unadorned, the-defendant-unlawfully-harmed-me accusations." *McCullough*, 907 F.3d at 1333 (citation omitted) (alterations adopted). The purpose of Rule 8 is to provide a defendant "with 'fair notice' of the claims and the 'grounds' for entitlement to relief." *Milo*, 2020 WL 134537, at *4 (quoting *Twombly*, 550 U.S. at 555–56).

To decide whether a complaint survives a motion to dismiss, district courts use a two-step framework. *McCullough*, 907 F.3d at 1333 (citation omitted). The first step is to identify the allegations that are "no more than conclusions." *Id.* (quoting *Iqbal*, 556 U.S. at 679). "Conclusory allegations are not entitled to the assumption of truth." *Id.* After disregarding the conclusory allegations, the second step is to "assume any remaining

factual allegations are true and determine whether those factual allegations 'plausibly give rise to an entitlement to relief.'" *Id.* "A court decides whether [Rule 8's pleading standard] is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer that the plaintiff is entitled to the legal remedy sought." *Milo*, 2020 WL 134537, at *4 (quoting *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011)).

When drafting his complaint, "[a] plaintiff must plead more than labels and conclusions or a formulaic recitation of the elements of a cause of action." *McCullough*, 907 F.3d at 1333 (quoting *Twombly*, 550 U.S. at 555). "To be sure, a plaintiff may use legal conclusions to structure his complaint, but legal conclusions 'must be supported by factual allegations.'" *McCullough*, 907 F.3d at 1333 (quoting *Iqbal*, 556 U.S. at 679). While courts, in ruling on a motion to dismiss, must take all of the factual allegations in a complaint as true; they are not bound to accept a legal conclusion couched as a factual allegation. *Iqbal*, 556 U.S. at 678. Courts must "identify conclusory allegations and then discard them—not 'on the ground that they are unrealistic or nonsensical' but because their conclusory nature 'disentitles them to the presumption of truth.'" *McCullough*, 907 F.3d at 1333 (quoting *Iqbal*, 556 U.S. at 681).

The issue to be decided when considering a motion to dismiss is not whether the claimant will ultimately prevail, but "whether the claimant is entitled to offer evidence

to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *overruled on other grounds by Davis v. Scheue*r, 468 U.S. 183 (1984). The factual allegations in a complaint "must be enough to raise a right to relief above the speculative level" and cannot "merely create[] a suspicion of a legally cognizable right of action." *Twombly*, 550 U.S. at 555. Finally, and in this case, critically, a complaint that tenders "'naked assertions' devoid of 'further factual enhancement'" will not survive against a motion to dismiss. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557) (cleaned up). To survive, a complaint must allege enough facts "to raise a reasonable expectation that discovery will reveal evidence" supporting a claim. *Twombly*, 550 U.S. at 556.

**B.**     **Little Caesars' Motion to Dismiss**

In its Motion to Dismiss, Little Caesars first argues that Barreth's sex-based hostile work environment claim should be dismissed as violative of Rule 8 in that he does not state a claim that is plausible on its face. [Doc. 20-1 at pp. 3–7]. Second, Little Caesars argues that Barreth's retaliation claim must be dismissed for two reasons: (1) because it is outside the scope of the Charge of Discrimination filed with the Equal Employment Opportunity Commission ("EEOC") and (2) because the factual allegations surrounding it "fail . . . to plausibly suggest that [Little Caesars] subjected [Barreth] to unlawful retaliation." [*Id.* at pp. 7–13]. And third, Little Caesars argues that Barreth's constructive discharge claim is likewise "not plausible on its face." [*Id.* at pp.

13–15]. Set against the facts as presented by Barreth's First Amended Complaint and the foregoing standard, the Court addresses each argument in turn, below.

### 1.      Hostile Work Environment (Count I)

Generally speaking, to plausibly set forth a hostile work environment claim under Title VII, Barreth must show that his workplace was "permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive to alter the terms and conditions of [his] employment and create[d] an abusive working environment." *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).

It is somewhat of a rare instance when parties agree with one another as to the legal elements that form or govern a particular claim. But here, both Barreth and Little Caesars agree that to establish a prima facie case for a hostile work environment claim, Barreth must show:

> (1) that he belongs to a protected group; (2) that he has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee, such as [sex]; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability.

*Id.*; *see* [Doc. 20-1 at p. 3] *in connection with* [Doc. 28 at p. 5]. While they agree on *what* Barreth must establish to create his prima facie case, Little Caesars, of course, does not agree that he can establish all five elements, or prongs, listed above.

For starters, Little Caesars concedes the first three prongs. Barreth belongs to a protected group. *Bostock v. Clayton Cty.*, 590 U.S. ----, 140 S. Ct. 1731 (2020). He was subjected to unwelcome harassment. And the harassment he complained of was "on account of" his sex. *Id.* at 1739, 1742 ("transgender status [is] inextricably bound up with sex"). Instead, to demonstrate that Barreth's hostile work environment claim should not survive, Little Caesars argues that the harassment allegations in this case do not satisfy the fourth and fifth[3] prongs. That is, Barreth's allegations fail because they are "not sufficiently severe or pervasive to alter the terms and conditions of employment" and that Little Caesars, as his employer, is not responsible for the hostile environment under either a theory of vicarious or direct liability. [Doc. 20-1 at p. 3 (citing *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1291 (11th Cir. 2012))].

As for the fourth prong—the United States Supreme Court has defined the "severe or pervasive" requirement as having both an objective and subjective component. *Miller*, 277 F.3d at 1276 (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993)). In other words, "to be actionable," the harassment "must result in both an environment 'that a reasonable person would find hostile or abusive' and an environment that the victim 'subjectively perceive[s] . . . to be abusive.'" *Id.* (alterations in original). Ostensibly, in an attempt to plead objectivity, Barreth claims—in a quintessential formulaic recitation of an element of a cause of action—that "the conduct

---

[3] *See* n.9, *infra.*

was severe [or] pervasive enough to create a hostile work environment that a reasonable person would consider intimidating, hostile, and abusive." [Doc. 11 at ¶ 62]. Here, Little Caesars, however, argues that Barreth fails to plead sufficient facts to plausibly state that he was subjected to an actionable working environment because his claim is based "only on a small handful of questions and comments over a period of one week." [Doc. 20-1 at p. 4].

When evaluating whether the harassment allegedly suffered was objectively severe or pervasive, courts consider four factors. *Miller*, 277 F.3d at 1276 (citing *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 647 (11th Cir. 1997)). Parties bringing sex discrimination claims have—for 27 years—known that these four factors make up the interpretive guideposts that courts rely upon in determining whether an environment is objectively hostile or abusive. Thus, it should surprise no plaintiff that a complaint must provide some factual details regarding the severity and pervasiveness of the alleged harassment, if possible, using the factors established by *Miller*. And it goes without saying—a pleading that does nothing more than regurgitate these factors will always run afoul of federal-court pleading standards mandated by *Twombly* and *Iqbal*.

The four factors include consideration of the frequency of the conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with the employee's job performance. *Miller*, 277 F.3d at 1276; *Freeman v. City of Riverdale*, 330 F. App'x 863, 865 (11th Cir.

2009). "Although these factors help guide the inquiry, 'the objective element is not subject to mathematical precision.'" *Bennett v. Pipe Work Sols.*, No. 1:17-CV-858-CLM, 2020 WL 1479154, at *3 (N.D. Ala. Mar. 26, 2020) (quoting *Bryant v. Jones*, 575 F.3d 1281, 1297 (11th Cir. 2009)). While not explicitly clear, Little Caesars appears to argue that Barreth fails to establish the objective component—that a reasonable person would not find the work environment to be hostile or abusive. *See Harris*, 510 U.S. at 21–22.

Recalling the conduct at issue in this case, Barreth alleges four instances of supposed harassment. The first instance occurred when some unidentified coworker referred to Barreth as "she" on his first day of training. [Doc. 11 at ¶ 17]. Second, his shift leader, Ms. Williams, asked him questions about his physical anatomy, his ability to reproduce, and whether he was "on hormones." [*Id.* at ¶¶ 19–21, 23]. Third, after Barreth reported Ms. Williams' conduct to Ms. Lester, the store manager, he alleges that Ms. Williams subsequently "scrutinize[ed] his work," "assigned [him] to additional tasks," "blamed him for things" that were not his responsibility or fault, and "threatened to write him up." [*Id.* at ¶ 31]. And lastly, Barreth alleges that "his coworkers and supervisors" "frequently" made "inappropriate" and "disparaging comments to and about" him and his gender identity and called him a "he-she." [*Id.* at ¶¶ 33, 59].

Barreth claims that "[t]he conduct in question was directly connected to [his] sex, gender identity, and notions of stereotyping based on sex," but, as Little Caesars

stresses, he never alleges in his Amended Complaint that Ms. Williams' questions and comments were disparaging to his status as a transgender male, which the United States Supreme Court recently clarified is harassment based on one's biological sex. [*Id.* at ¶ 61]; [Doc. 20-1 at p. 4]; *see also Bostock, supra.* Seizing on this omission, Little Caesars argues that there is no allegation that Ms. Williams' comments and questions "reflect a bias or hostility" against Barreth for his "transgender status or gender non-conformity." [Doc. 20-1 at p. 4]. In fact, Little Caesars points out that Barreth even admits that Ms. Williams told him that she didn't want him "to be offended" before she asked her questions and made her comments. [*Id.* (citing [Doc. 11 at ¶ 20])].

In response to these arguments, Barreth asserts that Little Caesars has "misstated" his allegations. [Doc. 28 at p. 6]. Not really. Barreth would have the Court take Ms. Williams' questions as cutting, sarcastic remarks fashioned specifically to hurt him because he is a transgender male. Whereas Little Caesars wants the Court to view her questions as just that: questions. Barreth's Amended Complaint only states that "Ms. Williams then *asked* Mr. Barreth a series of offensive questions." [Doc. 11 at ¶ 20] (emphasis added). That's it. Aside from his arguments in briefing (which cannot be used to further amend his pleading),[4] there is nothing to indicate how or why Ms.

---

[4] "A plaintiff cannot amend the complaint by arguments of counsel made in opposition to a motion to dismiss." *Morgan v. Dick's Sporting Goods, Inc.,* 359 F. Supp. 3d 1283, 1292 n.4 (N.D. Ga. 2019). Factual allegations "must be properly linked in the complaint, not the response." *Cunningham v. Fulton Cty.,* No. 1:17-CV-05512-RWS, 2019 WL 162396, at *4 (N.D. Ga. Jan. 10, 2019) (citing *In re Androgel Anitrust Litig. (No. II),* 687 F. Supp. 2d 1371, 1381 (N.D. Ga. Feb. 22, 2010)).

Williams asked her questions. *See* Discussion, Sections (B)(1)(a)and (B)(1)(b), *infra*. There is no factual allegation that Ms. Williams intended her questions to be demeaning, nothing to suggest that she thought negatively of Barreth's transgender status (i.e., a biological female presenting as a male), and, most notably, there is nothing that even hints to the idea that Ms. Williams asked her questions to be hurtful or hostile towards Barreth.

Disregarding the conclusory allegation that her conduct was "offensive," we are left with the fact that Ms. Williams asked him four questions in a single conversation:

- "[D]o you have a dick?"

- "[D]o you have titties, or did you have them removed?"

- "[A]re you on hormones?" and,

- "[Y]ou probably can't have kids, can you?"

*McCullough*, *supra*; [Doc. 11 at ¶¶ 21, 23]. Looking just at the text of Ms. Williams' questions, as Barreth pled them in his Amended Complaint, there is nothing—factually speaking— to set the stage for what he characterizes in briefing, as interrogation-like questions intended to "malicious[ly] harass[ ]" him. [Doc. 28 at p. 6]. Barreth needed these sorts of allegations in his Amended Complaint, not his briefs, and making them now is too late. *See* n.4, *supra*. Sure, the way Ms. Williams phrased her questions isn't exactly the apex of professionalism or sensitivity expected in the modern workplace, but what the Court must decide on a Rule 12(b)(6)-based motion is whether Barreth

pled sufficient facts in his Amended Complaint to "nudge[ ]" his hostile work environment claim "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. That is—with regard to the fourth prong from *Miller*: does Barreth sufficiently allege that his workplace was "permeated with discriminatory intimidation, ridicule, and insult?" 277 F.3d at 1275; *Johnson v. Fulton Cty.*, No. 1:17-CV-03921-AT-WEJ, 2018 WL 2350172, at *3 (N.D. Ga. Apr. 12, 2018). To make this determination, the Court looks to the four factors listed above: frequency, severity, humiliation, and interference with work performance. *Miller*, 277 F.3d at 1276.

a.    *Frequency*

In addition to Ms. Williams' questions and her subsequent attitude towards him, Barreth also alleges that he was misgendered on his first day of training and that "his coworkers and supervisors began *frequently* calling him a 'he-she' and making similar disparaging comments to and about Mr. Barreth and his gender identity." [Doc. 11 at ¶¶ 17, 31–33] (emphasis added). As for the misgendering remark on his first day of training, who was this coworker? When was his first day of training? The Court simply can't fill in these factual gaps. That obligation will always lie with Barreth as the plaintiff. How "frequently" was he called a "he-she?" He, of course, doesn't say. What were the "similar disparaging comments?" Again, nothing is alleged. Who were the multiple supervisors? Crickets. Aside from Ms. Williams, Barreth does not identify any speaker or potential harasser, nor does he provide an approximate date on which these

14

unnamed speakers made their allegedly disparaging comments or called him a "he-she."

"He-she" was the only detail Barreth gave in his Amended Complaint. [*Id.* at ¶ 33]. The rest of his allegations are extremely general and vague. The "he-she" comments and the other "similar disparaging comments" made on top of Ms. Williams' questions (all within a one-month period) may have been enough to minimally satisfy the frequency element—if we had the supporting factual allegations detailing *what they were*. Saying that "coworkers and supervisors" made "similar disparaging comments" is nothing more than a "naked assertion" in desperate need of "factual enhancement." *Iqbal*, 550 U.S. at 556. And *Iqbal* tells us that isn't enough.

Chronologically speaking, Barreth doesn't provide clean, easy-to-understand date approximations to paint a detailed picture, but a close examination of the timeline presented by his Amended Complaint shows us that the "similar disparaging comments" came sometime after May 17, 2018. [Doc. 11 at ¶¶ 18, 33]. Which means, the alleged "similar disparaging comments" (however "frequently" made) had to occur within a seven-day time frame—until May 24, 2018, the last day Barreth could have reported for work. [Doc. 11 at ¶¶ 18, 33, 40–41].

"[F]requently," however, doesn't tell us much at all and certainly provides little, if any, factual context. For example, were these comments made every day he worked? How many days did he actually come into the store to work during his four-week

maximum employment? *See* [*id.* at ¶¶ 13, 40–41]. How many days did he physically work in the store between May 17, 2018, and May 24, 2018? If it was every day, and if he was called a "he-she" every day, and if indeed multiple supervisors and coworkers called him names, he needed to plead those minimal factual enhancements in his Amended Complaint. *Cf. Johnson*, 2018 WL 2350172, at *11. But he didn't.

Instead, he merely tossed in the factually-unsupported assertion that his coworkers and supervisors "frequently" made disparaging comments and called him a "he-she." [*Id.* at ¶ 33]. Barreth's use of "frequently" to describe his coworkers' and supervisors' allegations is nothing more than checking an elemental box. In *Twombly*-speak, it is "a formulaic recitation of the elements of a cause of action." *McCullough*, 907 F.3d at 1333 (quoting *Twombly*, 550 U.S. at 555).

Not only are many of his "allegations" gasping for factual air, he most importantly, doesn't even give a shred of detail as to what his coworkers' and supervisors' "similar disparaging comments" were, and he knows (or at least likely knows a description at minimum) who said them and how often they did so. Admittedly, a plaintiff is not required to "allege a 'specific fact' to cover every element or allege 'with precision' each element of the claim, [but] it is still necessary for a complaint to contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory.'" *Johnson*, 2018 WL 2350172, at *11 (quoting *Fin. Sec. Assurance, Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1282–

83 (11th Cir. 2007)). In many instances during the early stages of a lawsuit, it is definitely possible that an individual might be unidentifiable. But, as for this case, even something as quick as a simple description of unnamed individuals could be enough to save a claim because such a description would contain *factual allegations* required to be accepted as true at the motion-to-dismiss stage.

In light of the Court's ruling, it seems important to note that "our case law has never demanded daily incidents; there is no required benchmark of incidents per day or week or month. We cannot simplify this area of law to an arithmetic formula. Frequent conduct, be it daily or otherwise, is an important marker of pervasiveness." *Allen v. Ambu-Stat, LLC*, 799 F. App'x 703, 709 (11th Cir. 2020). However, a plaintiff can't just say that conduct "frequently" occurred as Barreth has done here. A plaintiff needs to give some factual detail: yes, "he-she" is one detail, but "similar disparaging comments" without more is not—it's a naked assertion that needed to be clothed in factual allegations. [Doc. 11 at ¶ 33]. Bottom line, Barreth should have included these comments so that he could support the "frequency" benchmark.

That said, because a complaint (at least in federal court) is more often than not at risk of facing a motion to dismiss, it seems unwise for a plaintiff to curtail or withhold factual allegations to support his claims and just assume that he has listed a sufficient

number of representative samples of misconduct.[5] All in all, the allegations as pled in Barreth's Amended Complaint are simply insufficient to establish the frequency factor of the severe and pervasive prong of a hostile work environment claim.

b.     *Severity*

Second, when looking at the severity of the alleged conduct, Barreth only claims that he was "extremely disturbed and offended by Ms. Williams' comments and questions." [*Id.* at ¶ 25]. This, however, only satisfies *Harris*'s subjective component, and in order to invoke the protections of Title VII, the conduct alleged must also be "severe or pervasive enough to create an objectively hostile or abusive work environment." 510 U.S. at 21. Again, Barreth makes important allegations in briefing that were desperately needed in his Amended Complaint. *See* n.4, *supra*. For example, Barreth "submits," in his Response, "that it is widely known that the term 'he-she' is a slur that is considered highly offensive and dehumanizing, not only to people who are transgender but even to those individuals who are not." [Doc. 28 at p. 6]. But again, he put this allegation in his brief, not his Amended Complaint.

Just as the district court noted in *Johnson*, the Court notes that Barreth's severity "allegations are thin." 2018 WL 2350172, at *11. For starters, "[c]ommon sense, and an

---

[5] This is not to say that a plaintiff must prove his case in his complaint, certainly not. But when a plaintiff uses legal conclusions and naked assertions to frame and structure his complaint, he nonetheless labors under the requirement to support those with factual assertions. By now, all plaintiffs are well aware that a court will look to a frequency factor to decide whether a hostile work environment claim is sufficiently pled, and merely saying "frequently" just isn't enough.

appropriate sensitivity to social context," help "distinguish between simple teasing . . .

and conduct which a reasonable person in the plaintiff's position would find severely

hostile or abusive." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998);

*Harris*, 510 U.S. at 23 ("[W]hether an environment is 'hostile' or 'abusive' can be

determined only by looking at all the circumstances."). When Barreth refers to Ms.

Williams' questions and comments, the Court hesitates to conclude as a matter of law

that they warrant protection under Title VII because "[t]he Supreme Court has

repeatedly emphasized that simple teasing, offhand comments, and isolated incidents,

unless extremely serious, will not amount to discriminatory changes in the terms and

conditions of employment." *Johnson*, 2018 WL 2350172, at *10 (citing *Oncale*, 523 U.S. at

81). For all we know, Ms. Williams' questions may have even been an innocent yet

unsophisticated attempt to get to know her new coworker, not an attempt to tease him

or ridicule him because he is a transgender male. Barreth doesn't plead one or the other

in his Amended Complaint and the Court cannot infer the context described by his

brief. *See* n.4, *supra*.

Clearly, some factual allegations putting all of this into context were greatly

needed. Nevertheless, at this stage, there is simply too little to conclude one way or the

other, with regard to the severity of the conduct alleged to support his claim, that Ms.

Williams' questions and the alleged "he-she" comments from Barreth's coworkers and

supervisors were "simply expressions of animosity or juvenile provocation." *Roberts v. Archbold Med. Ctr.*, 220 F. Supp. 3d 1333, 1350 (M.D. Ga. 2016).

Therefore, because of the difficulty in pleading factual allegations that someone's conduct "was motivated by . . . views about" Barreth's gender non-conformity (his sex), courts have afforded plaintiffs a "relatively low hurdle at the [this] stage." *Terveer v. Billington*, 34 F. Supp. 3d 100, 115–16 (D.D.C. 2014); *see also Rouse v. Berry*, 680 F. Supp. 2d 233, 236 (D.D.C. 2010) ("In the context of a fairly straightforward employment discrimination complaint, plaintiffs traditionally have not been subjected to a heightened pleading standard."). Thus, affording Barreth the "low hurdle"[6] he is due, the "he-she" comments and potentially *some* of Ms. Williams' questions are likely sufficient to establish the severity factor. *Terveer*, 34 F. Supp. 3d at 115–16. Therefore, the

---

[6] On the "low hurdle" issue, it bears noting that if the Court applied a more stringent application of the motion-to-dismiss standard, Barreth has, for all intents and purposes failed to plead *Harris*'s objective component. 510 U.S. at 21. His Amended Complaint states that his "direct supervisor, subjected [him] to conduct, epithets, and inappropriate comments that were *objectively offensive* and unwelcomed." [Doc. 11 at ¶ 59] (emphasis added). This allegation—that the comments were "objectively offensive"—is nothing more than a legal conclusion couched as a factual allegation and is therefore, not entitled to the presumption of truth. *Iqbal*, 556 U.S. at 678; *McCullough*, 907 F.3d at 1333. Again, including certain language related to objectivity—that certain terms are "considered highly offensive and dehumanizing"—would have greatly helped Barreth's Amended Complaint. [Doc. 28 at p. 6]. Furthermore, who is this "direct supervisor?" Is it Ms. Lester? Ms. Williams? Both? What "conduct, epithets, and inappropriate comments" is Barreth talking about? Williams' questions and comments? The "he-she" comments? Or is the over-generalized allegation all-inclusive? By reading the Amended Complaint as filed, no one could ever definitively discern that either Ms. Lester or Ms. Williams called Barreth a "he-she." Again, *if* a stricter standard applied, more would have been needed.

Court will give him the benefit of the doubt that the allegations as pled in his Amended

Complaint are sufficient to establish the severity factor.[7] *Id.* at 116.

c.       *Physically Threatening or Humiliating*

Similar to the Court's discussion on severity, the third factor—whether the

conduct was physically threatening or humiliating—as opposed to a mere offensive

utterance—needed some factual allegations to place all of this into context as well. As to

whether the alleged conduct was physically threatening or humiliating, Barreth, once

again, belabors on arguments and allegations that are misplaced in briefing to

demonstrate humiliation. For example, he properly pleads in his Amended Complaint

that he "was extremely disturbed and offended by Ms. Williams'" conduct and "felt

compromised and exposed in the workplace," but it is not until his opposition brief that

he states that Ms. Williams' conduct "demonstrate[s] prejudice against transgender

people." [Doc. 11 at ¶ 25, 36]; [Doc. 28 at p. 7]. But given his allegation that "he felt like

he was walking around naked and that people knew what parts he had in his pants[,]"

the Court is hard-pressed to say that the conduct alleged would miss the "humiliating"

portion of the third factor. [Doc. 11 at ¶ 36]. His allegations clearly detail a feeling of

humiliation, and the Court accepts that.

---

[7] However, even with the severity factor sufficiently pled, the Court cannot conclude that satisfaction of this factor alone suffices to constitute pervasiveness for a harassment action under Title VII because "boorish behavior" without any indication to how often it occurred will not be enough to evaluate the objective severity of the harassment. *Ambu-Stat*, 799 F. App'x at 709–10; *Miller*, 277 F.3d at 1276.

d.   *Interference with Job Performance*

The fourth prong in helping assess whether the harassment was sufficiently severe or pervasive looks to whether the conduct interfered with the employee's job performance. Although Barreth "felt compromised and exposed in the workplace," his Amended Complaint doesn't mention any fact that his coworkers' and supervisors' alleged conduct prevented him from doing his job. [*Id.*]. In fact, Barreth admits that he "returned to work on subsequent occasions," after the incident with Ms. Williams. [Doc. 11 at ¶ 31]. However, given her attitude towards him, he may have enjoyed work less, but he never alleges that he couldn't perform his job because of her comments, questions, and "increased harassment and scrutiny of his work." [*Id.* at ¶ 71]. Even if he had made such an allegation, "[j]ob performance criticism from a supervisor or manager is a common vicissitude on life in the working world, even if harsh or unjustified," and Title VII does not "ensure a workplace free of stress or criticism." *Carroll v. Lear Corp.*, No. 2:18-cv-495-WKW-WC, 2020 WL 1899091, at *21 (M.D. Ala. Jan. 6, 2020).

Of course, the Court recognizes that "[a] discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers." *Harris*, 510 U.S. at 22. Obviously, Barreth may have felt discouraged from remaining at

his job with Little Caesars given that he quit. [Doc. 11 at ¶ 39]. But without pleading any factual allegation that he couldn't perform the job for which he was hired because of his working environment altered because of his sex, the Court is once again left with the unrequited task to make extreme factual inferences on Barreth's behalf, and he has, therefore, failed to sufficiently plead the fourth factor.

To recap, despite amending his original pleading, Barreth "neglected to include specific factual allegations to bring [his] hostile work environment claim, against [Little Caesars], into the 'plausible' category." *Milo*, 2020 WL 134537, at *7. "Without knowing the nature of the facts underlying [Barreth's] claim, an objective factfinder could not determine whether [he] was subject to a hostile work environment, even when all of [his] current allegations are taken as true." *Id.* Based on the above discussion, the Court concludes that Barreth has failed to lay out a prima facie case for his hostile work environment claim.

While "notice pleading only requires that [a] plaintiff plead facts that 'support' a claim, not those that 'establish' it[,]" to deny Little Caesar's Motion to Dismiss would mean that the Court itself filled significant factual gaps or made large, over-reaching inferences instead of reviewing Barreth's Amended Complaint as he drafted it. *Terveer*, 34 F. Supp. 3d at 121. And that, the Court cannot do. It is not the Court's obligation to play "Connect the Dots" and push a plaintiff's complaint past the initial pleading stage into discovery.

Absolutely, "[p]leadings must be construed so as to do justice," but the Court giving its procedural blessing to this count of the Amended Complaint, replete with its noted deficiencies, would not be doing justice, it would be manufacturing it for Barreth. Fed. R. Civ. P. 8(e). While "the line from conceivable to plausible" is almost always a blurred one, Barreth's allegations[8] just aren't enough, and he has failed to sufficiently plead that the "harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment."[9] *Twombly*, 550 U.S. at 570; *Miller*, 277 F.3d at 1275. Accordingly, the Court **GRANTS** Little Caesars' Motion to Dismiss Barreth's hostile work environment claim.

### 2.     Retaliation (Count II)

Before turning to the substance of whether Barreth has established a prima facie retaliation claim, Little Caesars argues that he failed to administratively exhaust his

---

[8] Again, it has to be remembered that this is not the situation where a plaintiff is doing the best he could with some unknown facts about the defendant or third parties that will likely be developed through discovery—such as the legal name of an employer's independent contractor, the name of a former employee, or the defendant's corporate structure. In this case, Barreth knows the basic facts that form his pleading. He knows (or can at least describe) who said what to him, when they said it, how often they said it, if he was offended by it, etc. When a plaintiff knows the basic details of his case and fails to include them, he runs the risk that he may not meet the minimal procedural requirements mandated by *Twombly* and *Iqbal.*

[9] Since Barreth did not properly plead sufficient facts to support the fourth prong of his prima facie case and thereby failed to state a plausible hostile work environment claim, there is no need to discuss whether Barreth can establish the fifth prong—that the employer must be responsible for the discriminatorily abusive working environment under either a theory of vicarious or of direct liability. *Miller*, 277 F.3d at 1275; *see also Edwards v. Prime, Inc.*, 602 F.3d 1276, 1300–01 (11th Cir. 2010) (noting that to state a hostile work environment claim post-*Iqbal*, employee was required to allege facts sufficient to satisfy the above-quoted five elements).

retaliation claim with respect to his post-resignation allegations: issues with his final paycheck and the written statement in which Ms. Lester referred to Barreth with feminine pronouns. [Doc. 20-1 at pp. 7–9]; [Doc. 11 at ¶ 46]. However, under the "reasonable investigator" standard, Barreth's post-resignation allegations are allegations that could have been addressed during the EEOC investigation and, therefore, have been properly exhausted. *See* [Doc. 28 at pp. 9–12 (citing *Humble v. Cirrus Educ. Grp. Inc.*, No. 5:17-CV-192 (MTT), 2017 WL 6001501, at *3 (M.D. Ga. Dec. 4, 2017))].

However, even with a finding that he properly exhausted his administrative remedies on his post-resignation allegations, they still fail. First, the allegations regarding his final paycheck are, once again, vague and conclusory. He states that he was "supposed to be paid on June 5, 2018[,]" but did not receive his final paycheck until it "was mailed to him several days late." [Doc. 11 at ¶¶ 42–43]. By now, it should be palpably clear that this type of elusive pleading is not acceptable under *Twombly* and *Iqbal* and their progenies. Barreth knows exactly when he received his final paycheck in the mail (or at least when it was postmarked), and the Court will not allow him to skirt by on vague allegations such as "several days late." [*Id.* at ¶ 43].

To the extent Barreth hoped this portion of his retaliation claim would survive based on such a vague and conclusory statement, he is incorrect. The Eleventh Circuit Court of Appeals has already determined that a "four-day delay in *the issuance of* [a]

paycheck [is] not an 'adverse action'" to support a retaliation claim. *Siler v. Hancock Cty. Bd. of Educ.*, 272 F. App'x 881, 883 (11th Cir. 2008) (emphasis added). Pleading a time period greater than four days would have undoubtedly helped Barreth for this portion of his relation claim—if in fact, the delay is his final paycheck *issuance* was actually greater than four days. But as can be seen over and over throughout his Amended Complaint, Barreth pleads only the most basic, vague, and over-generalized allegations hoping they will suffice. Simply put, the Court cannot accept his naked assertion of "several days late," more is needed. Accordingly, the Court **DISMISSES** this portion of Barreth's retaliation claim because it is not plausible on its face as alleged. *Twombly*, 550 U.S. at 570.

Second, Barreth mentions a statement written by Ms. Lester. [Doc. 11 at ¶ 46]. Seemingly, Barreth includes this allegation in his Amended Complaint in an attempt to show an act of retaliation by harassment, but the Court finds that this issue of retaliation likewise fails.[10] He pleads,

> In addition to the problems with the final paycheck, [Little Caesars] has taken additional actions to harass Mr. Barreth. For example, in a written statement dated *several months* after the incident, Mr. Lester writes: "Couple days later [Barreth] also came and talked to me *herself* about *her* life transition . . . ;" and, quite astonishingly, "[Barreth] also asked if myself and

---

[10] The Court assumes without deciding that the issue concerning the statement is intended to fall under Barreth's retaliation claim because it occurred after Barreth complained to Ms. Lester about Ms. Williams' alleged conduct. Additionally, Little Caesars argues the statement issue in the "retaliation" portion of its brief, and Barreth, in response, did not correct Little Caesars by stating that this issue was intended to support either of his other two claims. *See* [Doc. 20-1 at pp. 9–13] *in connection with* [Doc. 28 at pp. 9–15]. Barreth himself argues the statement issue in support of his retaliation claim. [Doc. 28 at pp. 14–15].

> other employees *could address her as male* [sic] *[because] she was transitioning*
> . . . ."

[*Id.*] (first emphasis added). Once more, Barreth's problem is chalked up to pleading deficiencies. He again uses the general allegation of "several" to substantiate this issue for his retaliation claim. How many months is "several?" Barreth knows exactly when Ms. Lester wrote this statement because he alleged that she "*dated*" it several months after the incident involving Ms. Williams. [*Id.*] (emphasis added). The Court knows Barreth's Amended Complaint inside and out, and looking at its four corners, it is impossible to discern exactly when Ms. Lester wrote the statement in which she misgendered Barreth with feminine pronouns.

That said, for a retaliation claim to be plausible, the temporal proximity between the protected activity (Barreth complaining to Ms. Lester about Ms. Williams) and the purported adverse action (the "additional actions to harass Mr. Barreth") must be "very close" in order to show a causal connection. *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (citing with approval circuit court cases invalidating temporal proximities of three and four months); [Doc. 11 at ¶ 46]. Without knowing how many months "several" encompasses, Barreth's allegation is simply too vague and conclusory to state a plausible retaliation claim on this issue, and it is **DISMISSED**. *See Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004) ("If there is a substantial delay between the protected expression and the adverse action in the absence of other evidence tending to show causation, the complaint of retaliation fails as a matter of law.").

Now, turning to what remains of his retaliation claim, is apparent that "a 'complaint need not allege facts specific to make out a prima facie case, [but] just enough factual matter to suggest retaliation.'" *Cox v. Fulton Cty. Sch. Dist.*, No. 1:19-cv-04520-JPB-RGV, 2020 WL 3046092, at *5 (N.D. Ala. May 22, 2020) (citations omitted). "A plaintiff alleging retaliation in violation of Title VII 'must begin by establishing a prima facie case; the plaintiff must show that (1) [he] engaged in statutorily protected activity, (2) an adverse employment action occurred, and (3) the adverse action was causally related to the plaintiff's protected activities.'"[11] *Knox v. Roper Pump Co.*, 957 F.3d 1237, 1244 (11th Cir. 2020) (quoting *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 959 (11th Cir. 1997)). Title VII prohibits an employer from retaliating against its employee because he opposed "any practice made an unlawful employment practice" by Title VII, or because he "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." *Gogel v. Kia Motors Mfg. of Ga., Inc.*, No. 16-16850, slip op. at 21 (11th Cir. July 29, 2020) (quoting 42 U.S.C. 2000e-3(a)). "The first part of the anti-retaliation provision is known as the 'opposition clause' and the second part as the 'participation clause.'" *Id.* (citing *E.E.O.C. v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1174 (11th Cir. 2000)).

---

[11] "To establish the necessary causation, a plaintiff must demonstrate that '[his] protected activity was a but-for cause of the alleged adverse action by the employer.'" *Gogel v. Kia Motor Mfg. of Ga., Inc.*, No. 16-16850, slip op. at 22 (11th Cir. July 29, 2020) (quoting *Univ. of Tx. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013)).

Stated another way, Title VII's protections include "internal complaints of discrimination to superiors, as well as complaints lodged with the EEOC and discrimination-based lawsuits." *Cox*, 2020 WL 3046092, at *5 (quoting *Gerard v. Bd. of Regents of State of Ga.*, 324 F. App'x 818, 825 (11th Cir. 2009)). This case clearly deals with protection under the opposition clause of Title VII that protects an employee from discrimination if he opposes an unlawful employment practice. *Ceus v. City of Tampa*, 803 F. App'x 235, 245 (11th Cir. 2020) (citing 42 U.S.C. § 2000e-3(a)).

 "The making of informal complaints or the use of an internal grievance system is protected conduct under the opposition clause[,]" and in order to seek protection under that clause, a plaintiff "must have a 'good faith, reasonable belief'" that the employer was engaged in unlawful employment practices. *Gogel*, slip op. at 42 (citing *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1311 (11th Cir. 2016)); *Cox*, 2020 WL 3046092, at *7 (quoting *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1351 (11th Cir. 1999)). A "plaintiff's burden under this standard has a subjective and objective component." *Ceus*, 803 F. App'x at 245. "This means that [Barreth] must show that [he] 'subjectively believed that [Little Caesars] engaged in unlawful discrimination and that [his] belief was *objectively* reasonable in light of the facts and record present." *Cox*, 2020 WL 3046092, at *7 (citation omitted); *see also Gogel*, slip op. at 30 (quoting *Rollins v. Fla. Dep't of Law Enf't*, 868 F.2d 397, 401 (11th Cir. 1989)) ("To qualify for protection under the opposition clause, 'the manner in which an employee expresses [his] opposition to an

allegedly discriminatory employment practice must be reasonable.'"). The "objective reasonableness of [Barreth's] belief" is measured against the controlling substantive law." *Ceus*, 803 F. App'x at 245 (citing *Butler v. Ala. Dep't of Transp.*, 536 F.3d 1209, 1214 (11th Cir. 2008)). However, in order to succeed on his retaliation claim, Barreth does not have to actually prove his underlying discrimination claim. *Sullivan v. Nat'l R.R. Passenger*, 170 F.3d 1056, 1059 (11th Cir. 1999) (citations omitted).

On the specifics of Barreth's retaliation claim, he alleges that after he "engaged in protected activity"[12]—when he complained of Ms. Williams' conduct—he "was subjected to increased harassment and scrutiny of his work [and] offensive and inappropriate comments." [Doc. 28 at p. 13 (citing [Doc. 11 at ¶¶ 70–71])]. When Barreth made his complaint about Ms. Williams to Ms. Lester, "[he] explained that Ms. Williams had asked him questions about his genitalia and discussed his supposed inability to reproduce" and "that this interaction made him feel offended and extremely uncomfortable." [Doc. 11 at ¶ 27]. Because Barreth cannot rely on Ms. Lester, or by extension, Little Caesars to infer that discrimination is occurring, he must, at the very least, communicate[13] his belief that discriminatory misconduct has occurred. *See Bailey v. DAS N. Am. Inc.*, No. 2:17-cv-732-RAH-WC, 2020 WL 4039193, at *13 (N.D. Ala. July

---

[12] This is another example of a "formulaic recitation of the elements of a cause of action." *McCullough*, 907 F.3d at 1333 (quoting *Twombly*, 550 U.S. at 555).

[13] A complaint "constitutes protected opposition only if the [employee] explicitly or implicitly communicates a belief that the practice constitutes unlawful employment discrimination." *Bailey*, 2020 WL 4039193, at *15 (quoting *Murphy v. City of Aventura*, 383 F. App'x 915, 918 (11th Cir. 2010)).

17, 2020) (quoting *Demers v. Adams Homes of Nw. Fla., Inc.*, 321 F. App'x 847, 852 (11th

Cir. 2009)).

Here, Barreth communicated to Ms. Lester, the store manager, that he felt

"offended and extremely uncomfortable," and albeit one time, this communication at

*this stage* of the litigation is enough. *See Bailey*, 2020 WL 4039193, at *15 (citations

omitted) (finding at summary judgment that "[s]imply complaining that one feels

'picked on' will not suffice."); [Doc. 11 at ¶ 27]. Again, the conduct opposed by Barreth

"does not in fact have to be unlawful." *Cox*, 2020 WL 3046092, at *8. Rather, at this early

procedural juncture, Barreth "need only plausibly allege that [his] belief that [Ms.

Williams'] conduct was unlawful under Title VII . . . was objectively reasonable." *Id.*

(citing *McArthur v. Northstar Funeral Servs. of Fla., LLC*, No. 10–24517–CIV, 2011 WL

1549007, at *1, *5 (S.D. Fla. Apr. 22, 2011)) (concluding that "while discovery may

ultimately reveal that plaintiff's claims cannot withstand a motion for summary

judgment, he had sufficiently pled facts alleging that he engaged in a protected activity

for purposes of surviving defendant's motion to dismiss" where he asserted that he

repeatedly complained about race discrimination by another employee) (alterations

adopted).

According to Barreth's Amended Complaint, he believed he "reported . . .

harassment," and that is all that is required at the pleading stage. [Doc. 11 at ¶ 70]. Even

though he only complained once, Barreth has sufficiently pled a claim for retaliation

under Title VII, and the Court must **DENY** Little Caesar's Motion to Dismiss Barreth's

retaliation claim with regard to the "increased harassment and scrutiny of his work

[and] offensive and inappropriate comments." [Doc. 28 at p. 13 (citing [Doc. 11 at ¶¶ 70

–71])]. Now, whether Barreth can prove "[Little Caesars] subjected [him] to adverse

employment actions in response to . . . participation in a protected activity" is a

question for another day. For now, his retaliation claim survives but only as to the

"increased harassment and scrutiny of his work" and "offensive and inappropriate

comments."[14] [*Id.*]; [Doc. 11 at ¶ 71].

### 3.    Constructive Discharge (Count III)

Finally, Little Caesars contends that Barreth's constructive discharge claim[15]

should be dismissed because his allegations "simply do not show his conditions were so

unbearable a reasonable person in his position would be compelled to resign." [Doc. 29

at p. 8]. In support of his constructive discharge claim, Barreth argues that Little Caesars

---

[14] These "offensive and inappropriate comments" are ostensibly the same "he-she" and "similar disparaging comments" the Court dismissed on Count I due to a lack of "further factual enhancement." *See* Discussion, Section (B)(1)(a), *supra*; [Doc. 11 at ¶ 33]. However, "[t]he scope of 'adverse employment actions' is broader in the anti-retaliation context than in the anti-discrimination context." *Saunders v. Emory Healthcare, Inc.*, 360 F. App'x 110, 115 (11th Cir. 2010) (citing *Burlington N. & Santa Fe. Ry. Co. v. White,* 548 U.S. 53, 68 (2006)). This relaxed standard allows the Court to consider several of the comments when evaluating Barreth's retaliation claim when it could not consider the same comments for his hostile work environment claim. Thus, applying the broader application for anti-retaliation, these "offensive and appropriate comments" may stand to support Barreth's pre-resignation issues for his retaliation claim.

[15] "[C]onstructive discharge is a claim distinct from the underlying discriminatory act." *Green v. Brennan,* 136 S. Ct. 1769, 1779 (2016); *contra Walsh v. City of Ocala,* No. 5:18-cv-402-Oc-30PRL, 2019 WL 4395297, at *7 (M.D. Fla. June 17, 2019) ("[T]his [c]ourt is not aware of . . . any authority suggesting that constructive discharge is a separate cause of action under federal law.").

"is seeking to have the Court apply a much stricter standard at the motion to dismiss stage, making largely-factual arguments in support of the Motion." *See* [Doc. 28 at pp. 15–16]. However, as explained below, "to prove constructive discharge, [Barreth] 'must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment.'" *See Bryant*, *infra*. That is what Little Caesars means when it argues that Barreth "cannot meet the higher standard required to establish a constructive discharge claim." [Doc. 20-1 at p. 14 (quoting *Palmer v. McDonald*, 624 F. App'x 699, 704 (11th Cir. 2015))].

Barreth's argument opposing this supposedly stricter standard is misguided. His argument primarily relies on a 1986 case from the Eleventh Circuit Court of Appeals explaining that "[m]otions to dismiss for failure to state a claim should be denied unless it appears *beyond doubt that the Plaintiff can prove no set of facts in support of its claims*." [Doc. 28 at p. 16 (quoting *Jackam v. Hosp. Corp. of Am.*, 800 F.2d 1577, 1579 (11th Cir 1986))]. However, *Twombly* abrogated this "no set of facts" language that comes from *Conley v. Gibson*, 355 U.S. 41 (1957). 550 U.S. at 561–63. The *Twombly* Court explained that this language "can be read in isolation as saying that any statement revealing the theory of the claim will suffice unless its factual impossibility may be shown from the face of the pleadings[,]" and that "[o]n such a focused and literal reading of *Conley*'s 'no set of facts,' a wholly conclusory statement of claim would survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish

some 'set of undisclosed facts' to support recovery." 550 U.S. at 560 (citing *Conley*, 355

U.S. at 45–46) (alteration adopted). To give fairness to the *Conley* Court, the *Twombly*

Court concluded by saying that the "no set of facts" "phrase is best forgotten as an

incomplete, negative gloss on an accepted pleading standard: once a claim *has been*

*stated adequately*, it may be supported by showing any set of facts consistent with the

allegations in the complaint." *Twombly*, 550 U.S. at 563 (emphasis added). Given that

*Conley*'s "no set of facts" standard no longer exists, Barreth will find little support from

it.

Regardless of whether the "no set of facts" standard is in play, Barreth is

nonetheless held to a higher standard for his constructive discharge claim. This "higher

standard" is not a pleading standard that entails some heightened level of fact-pleading

like when pleading special matters under Federal Rule of Civil Procedure 9. Instead, it

is merely a higher standard of law because establishing a constructive discharge claim is

more onerous and requires showing an even greater level of severity or pervasiveness

of harassment than is required for a hostile work environment claim. *Bryant*, 575 F.3d at

1298–99.

"The [constructive discharge] doctrine contemplates a situation in which an

employer discriminates against an employee to the point such that his 'working

conditions become so intolerable that a reasonable person in the employee's position

would have felt compelled to resign.'" *Green v. Brennan*, 136 S. Ct. 1769, 1776 (2016). "A

claim of constructive discharge therefore has two basic elements. A plaintiff must first prove that he was discriminated against by his employer to the point where a reasonable person in his position would have felt compelled to resign[,]" and he "must also show that he actually resigned." *Id.* at 1777. Here, Barreth has sufficiently pled the latter but not the former.

When evaluating constructive discharge claims, courts do not consider a plaintiff's subjective feelings. *Johnson v. La Petite Academy, Inc.*, No. 5:17-cv-01202-MHH, 2020 WL 2840090, at *6 (N.D. Ga. June 1, 2020) (citing *Hipp v. Liberty Nat. Life. Ins.*, 252 F.3d 1208, 1231 (11th Cir. 2001)). Instead, the Court uses an objective standard, and Barreth's "exposed" feelings and personal concerns have no legal bearing on this claim. *Id.*; *see also* [Doc. 28 at pp. 16–17].

Therefore, "[b]ecause [Barreth] has not shown that the mistreatment directed toward him rose to the level necessary to sustain a hostile work environment claim, his constructive discharge claim also fails." *Zarza v. Tallahassee Housing Auth.*, 686 F. App'x 747, 753 (11th Cir. 2017) (race discrimination). Accordingly, the Court **GRANTS** Little Caesar's Motion to Dismiss this claim.

## <u>CONCLUSION</u>

Applying the clear instructions from *Twombly*, *Iqbal*, and *McCullough*, the Court **GRANTS in part** and **DENIES in part** Little Caesar's Motion to Dismiss [Doc. 20]. The Court **DISMISSES** Barreth's sex-based harassment and hostile work environment

claim, any retaliation claim occurring after his resignation, and his constructive

discharge claim all **without prejudice**.[16]

      **SO ORDERED**, this 29th day of July, 2020.

S/ Tilman E. Self, III
_____
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**

---

[16] The Court **LIFTS** the Stay [Doc. 27] previously imposed, and the parties can expect a second Rules 16 & 26 Order to be filed shortly.